IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| KURT MUELLER,                              ) | |
|                                            ) | |
|         Plaintiff,                         ) | |
|                                            ) | |
|         v.                                 ) | Civil Action No. 1:12cv632 (CMH/TCB) |
|                                            ) | |
| UNITED STATES NATIONAL PARK                ) | |
| SERVICE, *et al.*,                         ) | |
|                                            ) | |
|         Defendants.                        ) | |
| _____           ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants United States National Park Service ("NPS"); Jonathan Jarvis, Director of the

National Park Service, in his official capacity; Karen Pittleman, Director, Wolf Trap National

Park for the Performing Arts ("Wolf Trap"), in her official capacity; and Duane Erwin, Chief

Ranger of Wolf Trap, in his official capacity (collectively, "Defendants"), through undersigned

counsel, respectfully submit this memorandum of law in support of their motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56.

**INTRODUCTION**

As the only national park in the United States dedicated to the performing arts, Wolf Trap

National Park for the Performing Arts in Vienna, Virginia, is uniquely designed to serve a

distinctive function.  The centerpiece of Wolf Trap is the Filene Center, a fenced-in theater that

accommodates more than 7,000 patrons, who purchase tickets to view performances while sitting

either indoors or outdoors.  Consistent with 18 U.S.C. § 930, which prohibits dangerous weapons

from "Federal facilities," firearms are not permitted in the Filene Center.

Plaintiff Kurt Mueller brings this lawsuit under the Administrative Procedure Act (APA),

5 U.S.C. § 706, to challenge the prohibition on firearms in the Filene Center.  Plaintiff alleges that he should be allowed to carry a concealed firearm into the Filene Center when he attends a "Rock of Ages" concert on September 9, 2012 for two reasons.  First, he alleges that the outdoor seating area known as the "Lawn" is not a "building or part thereof," 18 U.S.C. § 930(g)(1), as a "Federal facility" is defined under the statute.  Second, he alleges that he purportedly would be "lawfully carrying [a] firearm. . . incident to . . . hunting or other lawful purposes," *id.* § 930(d)(3) – an exception to the prohibition on the carrying of firearms of § 930(a) – because he is licensed to carry a concealed firearm under Virginia and Florida law, and would be doing so in connection with "e.g., the lawful purpose of attending a performance," Compl. ¶ 20.

Plaintiff is incorrect in both respects, and the Court should grant summary judgment in favor of Defendants pursuant to Federal Rule of Civil Procedure 56.  The plain language of the statute supports the designation of the entire fenced-in Filene Center as a "Federal facility" where firearms are prohibited.  In both design and function, the lawn seating area of the Filene Center is as much an integral "part" of the "building" that contains the stage and covered seating areas as the indoor spaces.  18 U.S.C. § 930(g)(1).  Plaintiff's argument with respect to § 930(d)(3) fails because he cannot demonstrate a "lawful purpose[]" that requires carrying a firearm in the Filene Center, and his broad construction of the statute would render § 930(a) superfluous.  Even if the Court were to find that the statute does not unambiguously support Defendants' construction, however, it should defer to Defendants' interpretation—an interpretation that advances the protective purposes for which 18 U.S.C. § 930 was enacted and ensures that Wolf Trap will continue to be able to carry out its unique cultural mission.

## STATEMENT OF UNDISPUTED FACTS

**I.     Wolf Trap National Park for the Performing Arts and the Filene Center**

Wolf Trap was a gift to the American people from Catherine Filene Shouse, who donated

the land of the former farm in Vienna, Virginia as a park where people could enjoy the

performing arts in a natural setting.  Defendants' Exhibit ("DEX") 1, Declaration of Karen

Pittleman, ¶ 5; *see also* H.R. Rep. No. 89-1821 (Aug. 9, 1966), *reprinted in* 1966 U.S.C.C.A.N.

3455, 3455 (" . . . . the primary purpose for which its rolling terrain will be set aside is that of

providing a setting worthy of the performances which will be scheduled for presentation there.").

In October 1966, it was established by Congress as a national park for the performing arts and

related educational purposes.  DEX 1, ¶ 5*; see* 16 U.S.C. § 284.

From its inception, Wolf Trap was intended to integrate the performing arts with natural

surroundings.  *See* H.R. Rep. No. 89-1821 (Aug. 9, 1966), *reprinted in* 1966 U.S.C.C.A.N. 3455,

3455 ("The plan of development includes not only the auditorium referred to above but also a

natural amphitheater . . . .").  When the original auditorium burned down in 1982, Congress

provided financial assistance to rebuild "all real property and fixtures which are within or

directly related to the Filene Center."  Pub. L. 97-310, § 11, 96 Stat 1455 (1982) (codified at 16

U.S.C. § 284j).

Today, Wolf Trap consists of approximately 117 acres.  DEX 1, ¶ 6.  Its centerpiece is

the Filene Center, which is comprised of a covered performance area and offices, a covered

seating area (the "House"), an uncovered managed turf viewing area ("the Lawn"), and the Plaza

(the "Plaza"), an asphalt area inside the Main Gate structure used as "spillover" seating and to

access restrooms and food services.  *Id.*  The Filene Center, which covers 4.564 acres, *id.,* also

includes the Main Gate structure, the South Gate structure, and the Food Services "A" structure. *Id.* & Attachment ("Att") B (aerial photographs showing patrons using the Filene Center). Filene Center patrons generally purchase tickets for either specific numbered seats in the covered seating area, or the use of the Lawn, to view performances inside the covered structure. DEX 1, ¶ 7. The Plaza also serves as a "spillover" seating and congregation area for patrons during certain types of shows and festivals. *Id.*

The covered seats in the House, the Lawn seating, Plaza and visitor services areas housed in the ancillary structures are all integral—and integrated—parts of the theater. DEX 1 ¶ 9. For example, the main Lawn area is divided into three main panels, separated by Staircases B & C, which serve as outdoor aisles that descend from the Plaza to the back of the House. *Id.* The aisle lighting on Staircases B & C is on the same control circuit as the aisle lighting in the House and the lighting on the two elevated walkways that lead from the Lawn to the back of the balcony. *Id.* The same is true of a dimmable lighting circuit for Staircases B & C and the House lighting. *Id.* The columns supporting the balcony of the House are located at the outer corners of the building and at the bottom of Staircases B & C so that no columns obstruct the view of the stage from the Lawn. *Id.*

The Main Gate structure, which houses large patron restrooms, the primary food services area, a gift shop, cushion storage and rental area, and box office sales windows, has been equated to the lobby and front of house functions of a more traditional, indoor venue. DEX 1, ¶ 10. When it was being re-designed and replaced in 2007, there was much attention given to the Main Gate's relationship to the Lawn and the surrounding buildings to ensure there would be no impact on sight lines or acoustics for Lawn patrons and to limit any light from the gift shops or

4

food services that would interfere with the Lawn patrons' experience.  *Id.*

NPS's brochure effectively summarizes the integrated nature of the indoor/outdoor theater:

> Inside the Filene Center, patrons stride down gently sloped stairs, enter wide aisles, and settle into their seats.  Outside the theater on the grass, couples close picnic baskets and adjust colorful blankets while children wriggle onto seats claimed as their own.  For the nearly 4,000 people seated inside the house and the 3,000 on the lawn, there is a feeling of intimacy with the performance on stage and with the natural setting that surrounds them.
>
> Inside the Filene Center cool breezes and moonlight flow through vertical open-air expanses that alternate with panels clad with Douglas fir.  Reminiscent of a fringe of gigantic trees, the timbers reflect sound from the stage back to the audience and provide exceptional acoustics in this partially enclosed theater.  Outside, the audience enjoys the best of both worlds—the performance on stage and nature's show found in the grassy meadows and lofty trees of this 118-acre[1] park.

DEX 1, Att. A.

The Filene Center is entirely enclosed by fencing, gates, and the exterior walls of three ancillary structures that house restrooms, food services, and the Main Gate, South Gate, and Food Services "A" building.  DEX 1, ¶ 8.  During performances, access to the entire interior area of the Filene Center is limited to ticketed patrons.  *Id.*

## II.    Wolf Trap Foundation

Pursuant to 16 U.S.C. § 284d, NPS has a Cooperative Agreement with the Wolf Trap Foundation ("Foundation"), a non-profit organization that manages performances, ticketing, and other services at the Filene Center.  DEX 1, ¶ 14. The Foundation's web page describes the Filene Center as "[a]n outdoor performing arts amphitheater with in-house (covered, fixed) and

---

[1]Measurements taken more recently than the brochure was printed indicate that the actual acreage is closer to 117 acres.  *See* DEX 1, ¶ 6.

lawn (uncovered, grass) seating." *Id.*, Att. C.  As depicted in the Foundation's "Filene Center

Seating Chart," patrons may purchase tickets either for indoor or outdoor seating.  *Id.,* Att. D.

The Foundation is also responsible for all concessions and food services in the park.

DEX 1, ¶ 15.  As part of their food and beverage service within the Filene Center they sell

alcoholic beverages, including beer, wine, and hard liquor.  *Id.*  Patrons are also permitted to

bring into the Filene Center Lawn and Plaza areas their own food and beverages, including

alcohol (with the exception of kegs) for consumption before and during the performance.  *Id.*

In addition to handling tickets and food, the Foundation also contracts with

approximately 100 performance artists each season.  *See* DEX 2, ¶¶ 3-5, Declaration of Ann

McPherson McKee, Senior Vice President of Performing Arts and Education ("McKee

Declaration").  As the McKee Declaration explains, while each contract between an artist and the

Foundation is unique, most artists require at least two terms relating to safety to be included in

their agreements: (i) a "Safety Clause," which requires the Foundation to provide a safe

environment for the artist, and (ii) a "Termination Clause," which excuses the artist from

performance of the contract if the artist or his/her producer reasonable believes that performing

would jeopardize the artist's safety or that of patrons attending the performance.  *See id.* ¶¶ 6-8

& Att. A (representative contract entitled "Bonnie Raitt Legal Rider 2012" at originally-

numbered pages 9 of 17 (IV.A) and 12 of 17 (V.H.1)).

### III.     Federal Personnel Working at Wolf Trap

There are numerous Federal employees who work at Wolf Trap and in the Filene Center.

The Filene Center is occupied year-round by at least five full-time federal employees who work

for NPS.  DEX 1, ¶ 18.  A United States Park Police contracted security guard is also on the

premises 24 hours a day, seven days a week, 365 days a year.  *Id.*  The Division of Performing

Arts has four permanent, full-time staff who are NPS employees, and occupy a suite of offices

year-round in the backstage area of the Filene Center.  DEX 1, ¶ 19.  These individuals include

three theater specialists and a production assistant.  *Id.*

The House Manager, who is a NPS employee, also has an office year-round in the

backstage area of the Filene Center.  DEX 1, ¶ 21.  During the performing season, the House

Manager is responsible for overseeing a staff of about 40 paid ushers and more than 700 weekly

volunteer ushers, approximately 90 to 110 of whom work at each show.[2]  *Id.*

During the performing season, between 8 a.m. and 12:30 a.m., the Stage Door of the

Filene Center is manned by two staff, who can be either paid or volunteer.  DEX 1, ¶ 24.  Park

Rangers (both permanent staff and volunteer) are based in the Ranger Station, which is just

outside of the Filene Center.  *Id.*, ¶ 25.  During the shows, Rangers patrol outside the Filene

Center and also provide security and first aid duties inside the Filene Center gates when needed.

*Id.*  United States Park Police officers are also present at Wolf Trap for every show, and operate

out of a trailer that is adjacent to the Filene Center.  *Id.*, ¶ 26.   The number of uniformed and

plain clothes Park Police officers present, and the location of those officers, is dependent on the

type of show and the expected size and make-up of the crowd.  *Id.*

---

[2]The paid ushers are hired as NPS seasonal employees.  DEX 1, ¶ 21.  The unpaid ushers are volunteers who work under the National Park Service Volunteer In The Park Program, which is authorized under the Volunteer In The Park Act of 1969, 16 U.S.C. §§ 18g-18i.  *Id.*  Pursuant to 16 U.S.C. § 18i, these volunteer ushers are considered Federal employees for purposes of tort and personal property loss claims and workman compensation, but not for purposes of hours of work, rates of compensation, leave, unemployment compensation and Federal employee benefits.  *Id.*

Employees of the Maintenance Division, who are NPS employees, handle all grounds-maintenance and custodial duties within the Filene Center year-round. *See id.*, ¶ 27. Among other responsibilities, the grounds crew is responsible for watering, mowing, trimming and keeping the Lawn manicured in the performing season and aerating, fertilizing and treating the Lawn in the non-performing season. *See id.*, ¶ 28. Custodial employees clean and maintain the restrooms and food facilities, among other areas of the Filene Center. *See id.*

Finally, the "Musician's Lounge," a large space on the Filene Center's lower level, is regularly used year-round for meetings and training sessions by NPS employees from both Wolf Trap and other parks within NPS's National Capital Region. *Id.*, ¶ 29.

## IV.   Prohibition of Firearms at Wolf Trap

In 1983, the Secretary of Interior ("Secretary") promulgated 36 C.F.R. § 2.4, which generally banned firearms from units of the National Park System. *See* 48 Fed. Reg. 30282 (June 30, 1983). The regulation was promulgated pursuant to 16 U.S.C. §§ 1 and 3, which authorize the Secretary to make rules and regulations governing the use and management of units of the National Park System.

On May 22, 2009, however, Congress enacted the Credit Card Accountability and Disclosure Act of 2009, a portion of which limits the Secretary's ability to restrict firearms in property under his jurisdiction. *See* Pub. L. 111-24, Title V, § 512, 123 Stat. 1764 (2009) (codified at 16 U.S.C. § 1a-7b). Dubbed the "Coburn Amendment" because one of its sponsors was Oklahoma Senator Tom Coburn, the relevant portion provides that the Secretary "shall not promulgate or enforce any regulation that prohibits an individual from possessing a firearm . . . in any unit of the National Park System" where "(1) the individual is *not otherwise prohibited by*

8

*law from possessing the firearm*; and (2) the possession of the firearm is in compliance with the law of the State in which the unit of the National Park System . . . is located."  16 U.S.C. § 1a-7b (emphasis added).

As to Wolf Trap, NPS determined that an individual is "otherwise prohibited by law" from bringing firearms into the Filene Center because 18 U.S.C. § 930, which bans firearms in any "Federal facility," prohibited their possession.  DEX 1, ¶ 30.  Accordingly, on February 21, 2010, NPS conspicuously posted signs at the Filene Center's public and service entrances that have the image of a handgun with a cross circle and the following text:

> WARNING: Firearms Prohibited.  Federal law prohibits the possession of a firearm or other dangerous weapon in this Federal facility unless specifically authorized. 18 USC 930(a) possession violations are subject to fine and/or imprisonment up to one year, while 18 USC 930(b) possession violations with an intent to commit a crime are punishable by a fine and imprisonment up to five years.

DEX 1 ¶ 31; *see also* 18 U.S.C. § 930(h) (requiring signs to be conspicuously posted at public entrances before anyone may be prosecuted under §§ 930(a) or (b)).

In response to a letter from an attorney questioning NPS's authority to ban firearms from the Filene Center in light of the Coburn Amendment, on July 13, 2010, Director Pittleman set forth in a letter NPS's rationale for considering the Filene Center, including its lawn viewing area, to be a "Federal Facility" under 18 U.S.C. § 930.  DEX 1 ¶ 32 & Att. F.  The letter explained that "[g]iven the long-standing design, usage, and treatment of the covered portion of the Filene Center and its lawn viewing area as an integral unit, the lawn viewing area is part of this 'Federal facility' where firearms are prohibited, insofar as it constitutes a building or part thereof under 18 U.S.C. § 930(g)(1) (emphasis added)."  *Id.*  The letter went on to explain why the "lawful purposes" exception found at 18 U.S.C. § 930(d)(3) does not allow for firearms in

the Filene Center.  *See id.*

NPS memorialized its policy concerning where firearms can and cannot be possessed in Wolf Trap in its April 16, 2012 Compendium.  Section 17 provides: "People who can legally possess firearms under applicable federal, state, and local laws can legally possess firearms in the park.  Federal law prohibits firearms in certain marked facilities, including the Filene Center."  DEX 1, ¶ 33 & Att. G.   The last sentence's reference to Federal law refers to 18 U.S.C. § 930.

## V.    District Court Litigation

Plaintiff *pro se* Kurt Mueller filed this lawsuit on June 8, 2012.  A Virginia resident, Plaintiff alleges that he possesses valid Virginia and Florida permits to carry concealed handguns.  Compl. ¶¶ 4, 8, & 9.  He further alleges that he holds a ticket for the lawn seating area of the Filene Center for a "Rock of Ages" concert on September 9, 2012, and that he intends to purchase lawn seating tickets for events in 2013 when they become available.[3]  *Id.* ¶ 16.  Plaintiff contends that "[t]he policies of the defendant [sic] presently interfere with the ability of Plaintiff to attend this event or events in the future while in possession of a concealed firearm." *Id.*  He seeks a declaration that Defendants' interpretation of 18 U.S.C. § 930 is contrary to the plain language of that statute on two grounds: (1) because, he alleges, the lawn viewing area and adjacent open areas of the Filene Center do not constitute a "Federal facility" as that term is defined in 18 U.S.C. § 930(g)(1), Compl. ¶ 19; and (2) because even if they are a "Federal

---

[3] The Foundation website describes "Rock of Ages" as a "[w]orldwide phenomenon featuring 28 '80s classic rock tunes from Journey, Night Ranger, Styx, REO Speedwagon, Pat Benatar, Twisted Sister, Poison, and many more." http://www.wolftrap.org/Home/Find_Performances_and_Events/Performance/12Filene/0909show12.aspx (last visited July 14, 2012).

facility," he would still be entitled to carry a firearm under the exception of 18 U.S.C. § 930(d)(3) because, he claims, he would be "'lawfully carrying [a] firearm . . . incident to . . other lawful purposes' (e.g., the lawful purpose of attending a performance)," Compl. ¶ 20.  Plaintiff also seeks an injunction preventing Defendants from prohibiting him from entering the Filene Center for the purpose of attending a concert while in possession of a concealed firearm.  *Id.* ¶ 23.

**SUMMARY JUDGMENT STANDARD**

The Court should grant summary judgment in favor of Defendants. Summary judgment should be granted where the evidence in the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if it might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over an issue of material fact is "genuine" under Rule 56(a) only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**ARGUMENT**

I.   **THE PROHIBITION OF FIREARMS FROM THE FILENE CENTER IS CONSISTENT WITH THE PLAIN LANGUAGE OF 18 U.S.C. § 930**

In determining that the Filene Center constitutes a "Federal facility" where firearms are prohibited under 18 U.S.C. § 930, Defendants properly gave effect to the plain meaning of the statute.  *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) ("In a statutory construction case, the beginning point must be the language of the statute . . . ."); *Johnson v. MBNA America Bank*, *NA*, 357 F.3d 426, 430 (4th Cir. 2004) ("In interpreting a statute, we must first "determine whether the language at issue has a plain and unambiguous meaning with regard

11

to the particular dispute in the case.'") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  18 U.S.C. § 930(a) makes it a crime to knowingly possess a firearm or other dangerous weapon within a "Federal facility."  A "Federal facility" is defined in 18 U.S.C. § 930(g)(1) to mean "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties."  18 U.S.C. § 930(d) excepts from the reach of § 930(a) "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes."

 As an integrated unit, both in function and design, the entire Filene Center is a "building or part thereof" under 18 U.S.C. § 930(g)(1).  Moreover, Plaintiff's desire to carry a concealed firearm while viewing a concert does not constitute the carrying of a firearm "incident to hunting or other lawful purposes."  18 U.S.C. § 930(d)(3).

## A.      The Entire Filene Center Is a "Federal Facility"

Since its establishment in 1966, Wolf Trap was designed to integrate the performing arts with natural surroundings.  *See* H.R. Rep. No. 89-1821 (Aug. 9, 1966), *reprinted in* 1966 U.S.C.C.A.N. 3455, 3455 ("The plan of development includes not only the auditorium referred to above but also a natural amphitheater . . . .").  Congress itself  defined the centerpiece of Wolf Trap—the Filene Center—as a space that encompasses both "real property and fixtures."  Pub. L. 97-310, § 11, 96 Stat 1455 (1982) (codified at 16 U.S.C. § 284j).  Likewise, the Wolf Trap Foundation's web page describes the Filene Center as "[a]n outdoor performing arts amphitheater with an in-house (covered, fixed) and lawn (uncovered, grass) seating."  DEX 1, ¶ 14 & Att. C.

Photographs of the Filene Center show how the covered seating area known as the

"House," the uncovered managed turf viewing area known as the "Lawn," and the spillover, asphalt area known as the "Plaza," function in an integrated manner inside a fenced and gated enclosure.   DEX 1, ¶¶ 6, 8 & Att. B (aerial photographs showing patrons using the Filene Center during a concert).   Patrons who have purchased tickets for the Lawn and those who have bought seats in the House together watch a performance that occurs on a single stage.   The Wolf Trap brochure eloquently describes how the indoor and outdoor spaces work as a unified whole, explaining that "[f]or the nearly 4,000 people seated inside the house and the 3,000 on the lawn, there is a feeling of intimacy with the performance on stage and with the natural setting that surrounds them."  DEX 1, Att. A.

The indoor and outdoor portions of the Filene Center not only function together, but also are physically unified.  As photographs show, ramps from the rear of the House balcony stretch down the sides of the Lawn like arms that embrace the patrons sitting there. DEX 1, Att. B. The main Lawn area is divided into three main panels, separated by staircases that serve as outdoor aisles that descend from the Plaza to the back of the House.  DEX 1, ¶ 9. The aisle lighting on these staircases is on the same control circuit as the aisle lighting in the House and the lighting on the two elevated walkways that lead from the Lawn to the back of the balcony.  *Id.*  The columns supporting the House balcony are located at the outer corners of the building and at the bottom of the Lawn staircases so that they do not obstruct the view of the stage from the Lawn. *Id.*

Plaintiff thus errs in contending that "the open air environment prevents the lawn seating area from being a federal facility because it is not 'a building or part thereof.'"  Compl. ¶ 19 (citing *United States v. Rodriguez,* 460 F. Supp. 2d 902, 911 (S.D. Ind. 2006)).  For the reasons

just identified, both in function and physical design, the Lawn seating area of the Filene Center is as much a "part" of the "building" that contains the stage and House seating as the covered parts of the Filene Center. 18 U.S.C. § 930(g)(1). It is plainly "an essential portion or integral element" of the Filene Center theater. Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/part (last visited July 18, 2012) (defining "part").

The *Rodriguez* case on which Plaintiff relies is readily distinguishable. There, a magistrate judge held that the criminal defendant could not be prosecuted under 18 U.S.C. § 930(a) for carrying a firearm in an employee parking lot of a U.S. Postal Service Processing and Distribution Center (PDC) because the parking lot was not a "Federal facility" under 18 U.S.C. § 930(g)(1). In determining that the parking lot was not a "building or part thereof," the magistrate judge stressed that the parking lot was situated "in the block immediately south of the PDC *with a public street and adjacent public sidewalks running between them*." 460 F. Supp. 2d at 905 (emphasis added); *see also id.* (noting that "the vehicle was 150 to 200 yards from PDC"); *id.* at 907 (noting again that the parking lot was "separated from the building in question by a public street and chain link fencing"). At Wolf Trap, by contrast, the Lawn is immediately adjacent to the House and even physically embraced by the arm-like ramps of the House that bookend the Lawn. And, whereas the parking lot in *Rodriguez* was surrounded by a fence of its own that cut it off from the street and the PDC, fences, gates, and walls surround the Lawn and House *collectively*. DEX 1, ¶¶ 8, 30. Furthermore, whereas the functions of a parking lot and a postal distribution center are different—one is for parking cars, the other for distributing mail—the function of the Lawn and the House of the Filene Center are the same: Both serve as areas from which patrons share in the experience of watching the same performance. DEX 1, ¶ 6.

Through its integrated function and design, therefore, the entire Filene Center is a "building or part thereof" under 18 U.S.C. § 930(g)(1).[4]

**B.   The "Lawful Purposes" Exception Does Not Allow Firearms to Be Carried Into the Filene Center**

The "lawful purposes" exception found at § 930(d)(3) does not allow patrons to carry firearms or other dangerous weapons into the Filene Center because that exception applies only when a lawful purpose related to the facility in question requires use of a firearm or dangerous weapon to be accomplished.  Section 930(d)(3) provides that § 930(a) "shall not apply to the lawful carrying of firearms or other dangerous weapons in a Federal facility *incident to hunting or other lawful purposes*."  18 U.S.C. § 930(d)(3) (emphasis added).  Plaintiff alleges that this exception allows him to bring a firearm into the Filene Center because he has a valid permit to carry a concealed firearm and would be carrying his weapon while engaging in "the lawful purpose of attending a performance." Compl. ¶ 20.  In contrast with Plaintiff's construction of the statute, Defendants' understanding gives effect to all of its language, comports with existing case law, and avoids rendering the requirement of a lawful purpose effectively meaningless.

Plaintiff's construction first fails because it impermissibly reads the term "incident to" out of the statute.  *See Inhabitants of Montclair Twp. v. Ramsdell,* 107 U.S. 147, 152 (1883) (explaining that courts should "give effect, if possible, to every clause and word of a statute").

---

[4] Plaintiff does not appear to dispute that the entire Filene Center, including the Lawn, is a place where "Federal employees are regularly present for the purpose of performing their official duties."  18 U.S.C. § 930(g)(1).  In any event, the Pittleman Declaration leaves no doubt that this is so.  *See* DEX 1, ¶¶ 18-29.  Numerous Federal employees – from security guards to theater specialists,  ushers, Rangers, maintenance workers – work in and around all parts of the Filene Center.

The statute does not say that § 930(a) "shall not apply to the lawful carrying of firearms or other dangerous weapons in a Federal facility [when the individual is present for] hunting or other lawful purposes."  18 U.S.C. § 930(d)(3).  Instead, it says that § 930(a) "shall not apply to the lawful carrying of firearms or other dangerous weapons in a Federal facility *incident to* hunting or other lawful purposes."  *Id.* (emphasis added).  The difference is critical.  Although § 930 does not define the word "incident," dictionaries define it to mean "something dependent upon, appertaining or subordinate to, or accompanying something else of greater or principal importance . . .," BLACK'S LAW DICTIONARY at 762 (6th ed. 1990); *see also* Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/incident (last visited July 17, 2012) ("1: something dependent on or subordinate to something else of greater or principal importance").  Giving effect to this definition, it is not enough that an individual carries a firearm in a Federal facility where he is present for a "lawful purpose;" rather, the "lawful purpose" must *depend on* or in some way *relate to* the carrying of a firearm in the Federal facility.

The only other district court to have construed § 930(d)(3) reached the same conclusion in *United States v. de la Cruz-Bancroft,* 2010 WL 8752034 (D.N.M. Jan. 4, 2010).[5]  There, an individual was charged under 18 U.S.C. § 930(a) after carrying a firearm into a federal building that housed a post office and bankruptcy court, among other state and federal agencies.  Observing that "[i]f the language of the statute is clear and unambiguous, the plain language of the statute controls," the court concluded:

> [T]he plain language of § 930(d)(3) is clear.  It provides that carrying a firearm in a Federal facility "incident to" hunting or other lawful purpose is lawful.  Thus, by its

_____

[5] A copy of this unpublished opinion is provided at DEX 3.

express terms the statute demands inquiry into defendant's purpose in bringing the firearm to a Federal facility. *In other words, the possession of the firearm must be not only lawful, but also must be for a lawful purpose that is related to the federal facility.* Any other interpretation would fail to give full effect to every word in the statute. *Quarles v. U.S. ex rel. Bureau of Indian Affairs*, 372 F.3d 1169, 1172 (10th Cir. 2004) (court should "construe the words of the statute in their ordinary sense . . . giv[ing] effect, if possible, to every word of the statute"). Thus, the Court holds that § 930(d)(3) applies to the lawful possession of a weapon incident to hunting or to another lawful purpose related to the Federal facility in question.

*Id.,* 2010 WL 8752034, at *2 (D.N.M. Jan. 4, 2010) (emphases added). Because the defendant in *de la Cruz-Bancroft* had not identified what his purpose was in bringing the firearm into the Federal facility and whether that purpose related to the Federal facility, the Court remanded for further proceedings.

The one example Congress provided in § 930(d)(3) – "hunting" – confirms that "lawful purposes" are those that depend on use of a firearm. *See Freeman v. Quicken Loans, Inc.*, 132 S.Ct. 2034, 2037 (2012) (citing the "'commonsense canon of *noscitur a sociis*, which counsels that a word is given more precise content by the neighboring words with which it is associated'") (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). One cannot engage in hunting without a firearm or other dangerous weapon, and it will often be necessary to carry a firearm in a Federal facility "incident to hunting," in order, for example, to pass through a visitor center at a national park where hunting is allowed, or to use a restroom while hunting. Section 930(d)(3) ensures that one can do so without running afoul of § 930(a).

In contrast with hunting, however, "attending a performance" does not *depend on* or *relate to* carrying a gun in a Federal facility. There is nothing intrinsic to the act of watching a concert that relates to carrying a firearm. As the Complaint admits, the purpose for which Plaintiff would be in the Filene Center on September 9, 2012 is to watch the "Rock of Ages" concert. *See* Compl. ¶ 16.

In addition to overlooking the words "incident to," Plaintiff's reading of the statute risks "swallow[ing] the prohibition set forth in § 930(a) generally prohibiting firearms and other dangerous weapons in federal facilities." *Cruz-Bancroft,* 2010 WL 8752032, at *3. Under Plaintiff's reading of § 930(d)(3), an individual would be entitled to carry a firearm in a Federal facility as long as he could articulate any purpose for being in the Federal facility. If this were the case, however, § 930(a) would become a nullity, as a putative defendant could virtually always come up with a lawful purpose for being in a federal facility. Such an interpretation would run afoul of the principle that statutes should be construed to avoid rendering language superfluous. *See Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991). Furthermore, it would undermine Congress's clear intent to protect Federal employees and others around them from violence. *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542 (1940) ("In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.").[6]

For these reasons, the Court should grant summary judgment in favor of Defendants, holding that under the plain language of § 930, the Filene Center is a "Federal facility" and the exception of § 930(d)(3) is inapplicable.

---

[6] Nor is it enough to satisfy § 930(d)(3) that Plaintiff allegedly has Virginia and Florida licenses that allow him to carry a concealed weapon. *See* Compl. ¶¶ 8 & 9. While the licenses may mean that he would be "lawful[l]y carrying" firearms at Wolf Trap under the first part of § 930(d)(3), licenses alone do not give him a "lawful purpose" for carrying the weapons incident to watching a performance.

**II.     TO THE EXTENT 18 U.S.C. § 930 IS AMBIGUOUS, THE COURT SHOULD DEFER TO DEFENDANTS' INTERPRETATION OF THE STATUTE**

Even if the Court were to find that the language of § 930 does not unambiguously support Defendants' interpretation, however, it should defer to their reading of the statute. Defendants' policy of prohibiting firearms from the Filene Center warrants substantial weight, as their specialized knowledge of Wolf Trap's design and function has allowed them to adopt an interpretation of § 930 that advances Congress's purposes in enacting § 930 and establishing the Filene Center.

**A.     Defendants' Policy of Prohibiting Firearms Is Eligible for Deference**

As in other cases that seek judicial review of agency action under the APA, 5 U.S.C. § 706, this Court should not interpret ambiguous language as if it were writing on a blank slate. Rather, to the extent the Court finds any portion of 18 U.S.C. § 930 ambiguous, Defendants' determination that the entire Filene Center constitutes a "Federal facility" where firearms are prohibited, is eligible for, at minimum, *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

When Congress enacted 18 U.S.C. § 930, it did not expressly delegate authority to a single agency to designate all "Federal facilities" where firearms were to be prohibited.   Instead, Congress implicitly left it up to each agency to post signs designating what it considered to be "Federal facilities."  *See* 18 U.S.C. § 930(h).  In practice, agencies such as NPS make these determinations independently, utilizing their knowledge of the unique usages and functions of their facilities. *See, e.g.,* DEX 1, ¶ 30.

NPS's policy of prohibiting firearms from the Filene Center, as evidenced through its posted signs, its July 13, 2010 letter, and its April 16, 2012 Compendium, is eligible for, at least,

*Skidmore* deference.[7]  In *Skidmore,* the Court justified giving respect to the agency's interpretation based upon its observation that the agency's policies were "made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case."  323 U.S. at 139.  The same is true here.  As both Director Pittleman's letter of July 13, 2010, and the appended declarations demonstrate, the determination that Wolf Trap's Filence Center constitutes a "Federal facility" under 18 U.S.C. § 930 is bound-up in specialized experience with and knowledge of the usages and functions of a unique facility.  Such experience and knowledge provide not only an understanding of the design features that distinguish the Filene Center from other facilities, but also of NPS's relationship with the Foundation, and how the Foundation's ability to attract artists would be compromised by permitting firearms into the Filene Center.  *See* DEX 2, ¶ 9.

It is precisely this kind of "informed judgment to which courts and litigants may properly resort for guidance."  *Skidmore,* 323 U.S. at 140.  Such informed judgment is particularly important in a case such as this one, where Congress has itself acknowledged that Wolf Trap is a unique facility, unlike any other units in the park system.  *See* 16 U.S.C. § 284a (providing that Wolf Trap shall be administered pursuant to 16 U.S.C. §§ 1-4 and 284, except that  "laws, rules, or regulations that are applicable solely to units of the National Park System that are designated as a 'National Park' shall not apply to Wolf Trap National Park for the Performing Arts").

---

[7]In *Bowen v. American Hospital Association*, 476 U.S. 610, 643 n. 30 (1986), the Supreme Court suggested in *dicta* that *Chevron* deference may be inappropriate where multiple agencies have promulgated policies under a particular statute, but it did not indicate that *Skidmore* deference would be unwarranted in such circumstances.  The Court has often held that even where *Chevron* deference is inappropriate, an agency's policy may nonetheless be entitled to *Skidmore* deference.  *See, e.g.*, *Alaska Dept. of Env'l Conser. v. E.P.A.*, 540 U.S. 461, 488 (2004); *Washington State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003).

Furthermore, Congress recognized in the organic statute of NPS that the agency is in the best position to make rules "for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service."  16 U.S.C. § 3; *see also* 16 U.S.C. § 1 ("The service thus established shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . .").  The determination of whether a facility constitutes a "Federal facility" under 18 U.S.C. § 930, and thus whether firearms may be prohibited, is clearly a decision that is integral to the "use and management of the parks."  16 U.S.C. § 3.

Given the specialized knowledge required to understand the unique usage and functions of the Filene Center, as well as Congress' intent to have NPS govern the "use and management" of units of the National Park System, NPS's interpretation of § 930 is clearly eligible for at least *Skidmore* deference.

**B.     The Court Should Defer to Defendants' Consistent and Thorough Interpretation of § 930**

Under *Skidmore*, where there is ambiguity in the language of a statute, "an agency's interpretation merits deference to the extent that the interpretation has the power to persuade." *Precon Development Corp., Inc. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 291 (4th Cir. 2011) (internal quotation marks omitted).  "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore,* 323 U.S. at 140.  The Court should find Defendants' interpretation of 18 U.S.C. § 930 to be persuasive because it is consistent with past pronouncements, Defendants have thoroughly considered the question of whether firearms must

be banned from Wolf Trap, their reasoning promotes the purposes of multiple Congressional enactments, and their interpretation avoids the absurd results that Plaintiff's construction would cause.

Defendants have not deviated from their interpretation of 18 U.S.C. § 930 since adopting it to ensure that NPS was in compliance with the Coburn Amendment.[8] On February 21, 2010, Defendants posted signs at the public and service entrances of the Filene Center indicating that firearms were prohibited under § 930. DEX 1, ¶¶ 30, 31. A few months later, in response to a letter from an attorney who questioned the posting of such signs on essentially the same grounds as Plaintiff now raises, Defendants thoroughly explained why the integrated nature of the Filene Center qualified it as a "Federal facility" and why the "lawful purposes" exception did not apply. DEX 1 ¶ 32, Att. F. Defendants then memorialized the policy of prohibiting firearms in the Wolf Trap Compendium on April 16, 2012—before Plaintiff filed his lawsuit. DEX 1, ¶ 33 & Att. G.

Defendants' reading of the statute advances the purpose of 18 U.S.C. § 930. *See Adler v. Comm'r of Internal Rev.*, 86 F.3d 378, 380-81 (4th Cir. 1996) ("[W]e best implement the intent of Congress by construing the statute in a way that gives effect to its purpose."); *In re Andrews*, 80 F.3d 906, 909 (4th Cir. 1996) ("We are left, then, to construe the phrase in accordance with its ordinary meaning or, if that meaning be ambiguous, to give it the meaning most consistent with the statute's purpose."). At the time § 930 was enacted, Congress explained that "[t]he provision is intended to protect federal employees, witnesses, judges, and others present in places where the business of the federal government is conducted." 134 Cong. Rec. S17360-02 (daily ed. Nov. 10, 1988) (Section analysis of Senate Judiciary Committee). Applying § 930 to the Filene Center

---

[8] Prior to the enactment of the Coburn Amendment in 2009, there was no need to designate the Filene Center as a "Federal facility" under 18 U.S.C. § 930 because firearms would have been prohibited pursuant to 36 C.F.R. § 2.4.

promotes that purpose by ensuring that the many Federal employees who work in and around the Filene Center, *see* DEX 1, ¶¶ 18-29, the artists who perform there, and members of the public who attend performances, are so protected.  The prohibition of firearms in the 4.564 acres that make up the Filene Center, DEX 1, § 6, and not the entire 117 acres of Wolf Trap, *id.,* underscores that NPS has reasonably prohibited firearms in a limited area that genuinely qualifies as a Federal facility.

The prohibition of firearms in the Filene Center also ensures that Wolf Trap remains dedicated to the "primary purpose" for which it was established: "that of providing a setting worthy of the performances which will be scheduled for presentation there."  H.R. Rep. No. 89-1821 (Aug. 9, 1966), *reprinted in* 1966 U.S.C.C.A.N. 3455, 3455; *see also* 16 U.S.C. § 284 (defining Wolf Trap as "a park for the performing arts and related educational programs").  In contrast with some other units of the National Park System, Wolf Trap's primary purpose is not to provide an expanse of land for recreational activities such as hunting, where one would need to carry a firearm or other dangerous weapon to carry out the activity.  Instead, it is to allow for performances in a natural setting—a purpose that does not require a firearm to be accomplished, and, indeed, would be hindered by allowing firearms into the Filene Center.  *See* DEX 2, ¶ 9.

As the McKee Declaration explains, most artists require at least two terms relating to safety to be included in their agreements with the Wolf Trap Foundation: (i) a "Safety Clause," which requires the Foundation to provide a safe environment for the artist, and (ii) a "Termination Clause," which excuses the artist from performance of the contract if the artist or his/her producer reasonable believes that performing would jeopardize the artist's safety or that of patrons attending the performance.  *See* DEX 2, ¶¶ 6-8 & Att. A (representative contract entitled "Bonnie Raitt Legal Rider 2012" at originally-numbered pages 9 of 17 (IV.A) and 12 of 17 (V.H.1)).  "If

23

dangerous weapons, including firearms, were permitted in the Filene Center at Wolf Trap,"

however, "the Foundation would be hindered in its ability to include a Safety Clause in future

contracts, and some artists would exercise a Termination Clause under existing contracts." *Id.,* ¶

9.  The Court should also defer to Defendants' interpretation, therefore, to avoid undermining the

important cultural purpose for which Wolf Trap was established.

Finally, Defendants' interpretation avoids the absurd results and enforcement problems

that Plaintiff's construction would cause.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564,

575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if

alternative interpretations consistent with the legislative purpose are available.").  Under

Plaintiff's view that the Lawn cannot be part of the Federal facility because it is an "open air

environment," Compl. ¶ 19, NPS could ostensibly prohibit persons from carrying firearms into

the covered restrooms at the Filene Center, but could not bar them from carrying firearms onto

the Lawn, where patrons spend far more time and are typically surrounded by many more people.

Any such interpretation would create serious problems of administration, as the gates of the

Filene Center would no longer mark a bright line between where one can and cannot carry a

weapon; instead, stepping into or out of a bathroom inside the gates of the Filene Center could

mean the difference between violating and not violating § 930(a).  Defendants' interpretation of

the statute would avoid such absurd results.

In sum, even if the Court were to find that the language of 18 U.S.C. § 930 is ambiguous,

it should defer to Defendants' construction.  Unlike Plaintiff's interpretation, Defendants'

construction of § 930 advances the purposes for which Wolf Trap was established and 18 U.S.C.

§ 930 was enacted, and avoids absurd results.

## CONCLUSION

For the foregoing reasons, the Court should find that the prohibition of firearms inside the

Filene Center is consistent with 18 U.S.C. § 930 and grant summary judgment in favor of the

Defendants.


Respectfully submitted,

NEIL H. MacBRIDE
UNITED STATES ATTORNEY

By:      _____/s/_____
Lauren A. Wetzler
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3752
Fax:        (703) 299-3983
Email: lauren.wetzler@usdoj.gov

COUNSEL FOR DEFENDANTS

OF COUNSEL:
Randolph J. Myers
Senior Attorney
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W. Room 5320
Washington, D.C. 20240

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2012, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, and will mail the document by U.S. mail to the following non-filing user:

Kurt Mueller
251 S. Reynolds St., M117
Alexandria, VA 22304
*Plaintiff pro se*

         /s/         
Lauren A. Wetzler
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3752
Fax:         (703) 299-3983
Email: lauren.wetzler@usdoj.gov
Counsel for Defendants
